**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DILLAN ROTH, | ) | |
| Plaintiff | ) | **C.A. No. 22-263 Erie** |
| | ) | |
| v. | ) | |
| | ) | **District Judge Susan Paradise Baxter** |
| EXACT SCIENCES CORPORATION | ) | |
| and KEVIN CONROY, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

## I.      INTRODUCTION

### A.      Relevant Procedural History

Plaintiff Dillon Roth brings this action pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e ("Title VII"), the Family Medical Leave Act of 1993, 29 U.S.C. § 2615(a) ("FMLA"), and the Pennsylvania Human Relations Act, 43 Pa. C.S. § 95, *et seq.*, against Defendants Exact Sciences Corporation ("ESC") and its Chief Executive Officer ("CEO") Kevin Conroy ("Conroy").

The operative complaint [ECF No. 29, Amended Complaint] contains five counts: Count I – religious discrimination under Title VII and the PHRA against Defendant ESC; Count II – unlawful retaliation under Title VII and the PHRA against both Defendants; Count III – violation of the FMLA against Defendant ESC; Count IV – unlawful retaliation and discrimination under the FMLA against Defendant ESC; and Count V – aiding and abetting discrimination under the PHRA against Defendant Conroy. As relief for his claims, Plaintiff seeks monetary damages.

After the parties completed discovery, Defendants filed a motion for summary judgment [ECF No. 46] that is now pending before the Court, along with a brief in support [ECF No. 47] and a concise statement of material facts ("CSMF") [ECF No. 48]. Plaintiff has filed a brief in

1

opposition to Defendants' motion [ECF No 54], together with a responsive CSMF [ECF No. 53], and Defendants have filed a reply to each of Plaintiff's submissions [ECF Nos. 58, 59]. In addition, Defendants have filed a supplemental brief in support of their summary judgment motion, after obtaining leave of Court to do so. [ECF No. 67]. This matter is now ripe for consideration.

### B.      Relevant Undisputed Material Facts[1]

ESC makes and sells Cologuard, a colorectal screening and diagnostic tool, and employs approximately 6,500 employees. (ECF No. 48 at ¶ 1). Conroy is ESC's CEO and Chairman of the Board of Directors. (Id. at ¶ 4). Plaintiff began working for ESC on December 2, 2019, as a Professional Medical representative ("PMR"). (Id. at ¶ 6). The PMR position is a field-based role, and Plaintiff spent most of his days out in his assigned territory interacting directly with healthcare providers to sell Cologuard. (Id. at ¶¶ 7-8). Plaintiff's visits to healthcare provider's facilities required Plaintiff to be in close proximity to patients, including standing in waiting rooms when patients were present and taking the same elevators as patients. (Id. at ¶ 9). Plaintiff typically visited around 40 healthcare providers in a given week. (Id. at ¶ 10). At the time of his separation from employment, Plaintiff reported to Tina Bloom ("Bloom"). (Id. at ¶ 12).

In or around March or early April 2020, ESC pulled PMRs from the field due to the COVID-19 pandemic. (Id. at ¶ 13). When PMRs returned to the field in or around June 2020, ESC implemented various safety measures to mitigate the spread of COVID-19, including masking, social distancing, and regular testing. (Id. at ¶ 14). On July 30, 2021, Conroy announced that, beginning September 15, 2021, ESC employees working onsite or visiting

---

[1] The factual recitation contained herein is gleaned from Defendants' CSMF [ECF No. 48], Plaintiff's responsive CSMF [ECF No. 53], and Defendants' reply thereto [ECF No. 58], to the extent the facts are materially relevant and either admitted by the parties or adequately supported by the record evidence.

healthcare facilities must be fully vaccinated against COVID-19, and that there would be a process for requesting accommodations for qualifying medical and religious reasons. (Id. at ¶ 15). As of August 3, 2021, ESC's COVID-19 policy was revised and provided: "Fully-vaccinated onsite and field employees who have provided proof of vaccination are no longer subject to a regular testing requirement." (ECF No. 58 at ¶ 137). On August 15, 2021, Conroy announced that the deadline to achieve full vaccination against the virus was extended from September 15 to October 1, 2021. (ECF No. 48 at ¶ 16). PMRs, including those who were unvaccinated, continued to visit health care providers in person between September 15, 2021 and October 1, 2021. (ECF No. 58 at ¶ 163).

On August 27, 2021, ESC revised its COVID-19 Response Policy to include the vaccination requirement, which Plaintiff understood applied to him and provided employees with qualifying sincerely held religious beliefs the option to request an accommodation. (ECF No. 48 at ¶ 17). When ESC announced the COVID-19 Response Policy, Plaintiff understood that employees who did not have an approved exemption from the vaccination requirement and who did not get vaccinated would be terminated. (Id. at ¶ 18). Plaintiff did not agree with ESC's decision to implement a COVID-19 vaccination requirement because he felt that there were a lot of unknowns about the vaccines and that "each person should be able to make their own health care decisions." (Id. at ¶ 20). For example, Plaintiff cited safety concerns about the COVID-19 vaccines, such as potential side effects like myocarditis and blood clotting, and he opined that there was not enough information available about the vaccines at the time. (Id. at ¶ 21). Plaintiff also expressed his belief that "natural immunity is oftentimes the best way to protect" against disease. (Id. at ¶ 22).

On August 9, 2021, Plaintiff emailed ESC's Leaves and Accommodations team to request a religious exemption from the COVID-19 vaccination requirement, and the team responded the same day by providing Plaintiff an accommodation request form. (Id. at ¶ 35). After consulting the CDC's website, which confirmed that many vaccine lines were derived from aborted babies, Plaintiff submitted his completed accommodation request form on August 11, 2021, which identified his religious belief, practice, or observance as follows:

> I believe the Bible states very clearly that our bodies are not ours, but rather we have been given them by God to be stewards over. Additionally, we are told that our bodies are temples of God and we must not defile them (quoting 1 Corinthians 6:19-20)… Protecting the body God has given me care of, therefore, includes protecting it by avoiding putting any potentially unclean substances in my body. Vaccines contain many hazardous substances, including neurotoxins, animal parts and cells, albumin from human blood, carcinogenic substances and foreign DNA. In addition, many vaccine lines have been produced using cells from aborted babies.

(Id. at ¶ 38; ECF No. 55-23 at p. 1).

Plaintiff further noted in the accommodation request that,

> I have grown up in church and have always been very involved but ever since my young adulthood I have more clearly understood the infallibility of Scripture and the truth that the Bible is God's perfect Word. Therefore, everything in it needs to be carefully observed and understood and leaves no room for individual interpretation or leeway….

(Id. at ¶ 39; ECF No. 55-23 at p. 1).

In explaining how his religious belief, practice, or observance specifically related to ESC's COVID-19 vaccination requirement, Plaintiff responded,

> … 1 Corinthians 3:16-17 says "Do you not know that you are a temple of God and that the Spirit of God dwells within you? If any man destroys the temple of God, God will destroy him, for the temple of God is holy, and that is what you are." Therefore, a vaccine requirement infringes upon my ability and devotion to protect the temple, my body, that God has given me. Additionally, as stated above, many vaccine lines have derived from aborted babies (citing CDC's website). The unborn are recognized by the

Bible as humans made in the image of God from the point of conception.
(Jeremiah 1:5; Psalm 139: 13-16), and I cannot in good conscience inject a
substance into my body that has been created with research on, and could
contain matter from, aborted babies. With this in mind, I view vaccines as
unclean, and unacceptable to put in my body. Vaccines are specifically
designed to change the way my body functions, and I cannot in good
conscience inject them into the body given to me by God.

(Id. at ¶ 40; ECF No. 55-23 at p. 2).

On August 18, 2021, Amy Ableidinger ("Ableidinger") from the Leaves and

Accommodations team emailed Plaintiff to ask clarifying questions about his religious

accommodation request: (1) whether Plaintiff was aware that the Pfizer and Moderna

vaccines do not contain fetal cell lines or matter from aborted babies; and (2) whether

such information changes his perspective. (Id. at ¶ 41). Plaintiff responded on the same

day, indicating that both vaccines used fetal cell lines in their confirmation tests, citing a

Bible verse, and stating that it would be impossible for him to "glorify God in his body"

if he received the COVID-19 vaccine because (1) research and testing for the vaccines

used fetal cell lines, and (2) the spike proteins in the vaccines alters the body's response

in a manner not designed by God." (Id. at ¶ 42). Roth describes his religious beliefs as

Christian, specifically Baptist. (Id. at ¶ 43).

Plaintiff believes that, based on data from the CDC, the COVID-19 vaccines are

ineffective when it comes to stopping the spread of the virus, preventing severe illness from the

virus, and preventing death from the virus. (Id. at ¶ 59). Plaintiff believes that the medical risk of

receiving any of the COVID-19 vaccines exceeds the benefit, and that the vaccines were

developed too quickly to be effective. (Id. at ¶¶ 60-61). Plaintiff also believes that media

endorsement of masking and vaccines in response to COVID-19 was propaganda that was both

financially and politically motivated, and that his natural immunity from previously having had

5

COVID-19 meant that a vaccine was unnecessary for him. (Id. at ¶¶ 66-67). Finally, Plaintiff admitted that "based on the evidence that [he has] seen," even if he did not hold his religious beliefs, he would come out in favor of not taking the vaccine. (Id. at ¶ 63).

On August 30, 2021, Plaintiff emailed Conroy links to two articles referencing a study from Israel about natural immunity being more effective than vaccination against COVID-19 and expressed his belief that natural immunity should play a factor in ESC's policy. (Id. at ¶ 68). Plaintiff did so to appeal to Conroy "on a medical scientific perspective" in order to persuade ESC to change its vaccination policy altogether. (Id. at ¶ 69). Conroy replied, "Even better protection is natural immunity coupled with vaccine immunity." (Id. at ¶ 70). Plaintiff responded by email asking Conroy to provide the source for his statement and stating, in part, "If you could please provide on [sic] scientific reason why an employee like myself, with prior infection, will be terminated on Oct. 1st when there is clear evidence that I am safer and less likely to carry the disease than a vaccine-mandated employee that would be appreciated…." (Id. at ¶ 71).

Conroy called Plaintiff's personal cell phone on August 31, 2021, and they spoke for approximately thirteen minutes, discussing their emails and the articles Plaintiff had sent to Conroy. During their discussion, Conroy criticized Plaintiff's grammar in their email exchange, giving him a letter grade, and stating that he was appalled that Plaintiff represented ESC and that Plaintiff had audacity. (Id. at ¶ 72; ECF No. 58 at ¶¶ 182-183, 187-188, 194-195). Conroy also encouraged Plaintiff to get vaccinated, asking Plaintiff what his risk of receiving the COVID-19 vaccine was. (ECF No. 48 at ¶ 74). Neither party discussed religion generally or Plaintiff's religious beliefs during their phone call. (Id. at ¶ 76).

After his conversation with Conroy, Plaintiff complained about the call to his direct supervisor, Bloom, who knew that Plaintiff had already submitted an exemption request at the

6

time. (ECF No. 58 at ¶¶ 220-221). Bloom reported her discussion with Plaintiff to an HR business partner. (Id. at ¶ 223). Conroy told Bloom that he had a call with Plaintiff because he was "very disappointed in different aspects of the email" he received from Plaintiff, but admitted that he "should not have engaged" with him. (Id. at ¶¶ 227, 232). Conroy then forwarded the emails he exchanged with Plaintiff to Bloom, who sent them to her direct supervisor, Mark Clough. (Id. at ¶ 234).

Plaintiff also called another member of ESC's HR advisor team, Juliet McClellan ("McClellan"), to report what happened with Conroy and to express his fear of retaliation. (Id. at ¶¶ 235, 242-243). In particular, McClellan noted that Plaintiff told her he "knows his exemption will be rejected and [Conroy] doesn't want [him] here." (Id. at ¶ 250). McClellan reported her call with Plaintiff to Krista Sterken ("Sterken"), a member of ESC's legal compliance team. (Id. at ¶¶ 240, 252). A few days later, McClellan called Plaintiff back and told him that Conroy was not involved in the accommodation process. (Id. at ¶ 254). McClellan never spoke with Conroy about Plaintiff and did not conduct an investigation regarding Plaintiff's phone conversation with Conroy. (Id. at ¶¶ 258, 261).

Conroy learned that Plaintiff reported him to HR within a week or so after his phone conversation with Plaintiff. (Id. at ¶ 291). Within a short time after Plaintiff reported him to HR, Conroy had a separate meeting with Sterken, who asked him a series of questions. (Id. at ¶¶ 292-293). According to Conroy, he was cleared of the substance of Plaintiff's complaint and was not disciplined. (Id. at ¶ 297).

On September 8, 2021, Plaintiff requested FMLA leave through ESC's third-party administrator for leaves of absence, based on the impending birth of his child on September 26, 2021. (Id. at ¶¶ 81-82). Plaintiff's leave request was granted effective September 27, 2021. (Id. at

¶ 83). Plaintiff never informed anyone at ESC that he would become vaccinated upon his return from leave; rather, Plaintiff wanted to delay his termination until after his leave ended. (Id. at ¶¶ 85-86). In fact, Plaintiff has never received the COVID-19 vaccine. (Id. at ¶ 88).

Conroy and ESC's Executive Vice President of Human Resources, Sarah Condella ("Condella"), made the Company-wide decision that employees who had to visit health care providers' offices, including PMRs, could not remain in their roles unvaccinated. (Id. at ¶ 89). According to Condella, this decision was made to ensure PMRs weren't transmitting COVID-19 to health care providers and patients. (Id. at ¶ 90). Employees who had legitimate religious or medical bases to seek an exemption from the COVID-19 vaccination requirement were offered the opportunity to apply for another role for which they were qualified as an alternative accommodation, or accept severance, (Id. at ¶ 91).

On September 27, 2021, ESC informed Plaintiff in an email that his exemption request was denied, stating as follows:

> You recently requested that [ESC] provide an accommodation to allow you to remain unvaccinated in your position, notwithstanding the Company's vaccination policy. Your request is being denied because: Allowing you to remain unvaccinated in your role is not a reasonable accommodation because of the safety risk you would pose to others (including but not limited to medically vulnerable patients and professionals providing healthcare services) as well as the associated negative reputational, relational, and access impacts on the Company.

(ECF No. 58 at ¶ 316). Similar emails were sent at approximately the same time to other employees, including PMRs, whose exemption requests were denied for the exact same reason regardless of whether the individual sought an accommodation for religious or medical reasons. (Id. at ¶¶ 317-318). Ultimately, ECS decided that employees required to visit healthcare professionals' offices would not be provided exemptions to the COVID-19 vaccination requirement. (Id. at ¶ 319). Conroy was the primary decisionmaker in this regard. (Id. at ¶ 321).

In the September 27, 2021 email denying his exemption request, Plaintiff was provided three options: (1) become fully vaccinated against COVID-19 by November 19, 2021; (2) express interest in an alternative role within the company that did not require visiting health care providers ; or (3) resign from his employment with severance. (Id. at ¶ 342). Plaintiff responded on September 28, 2021, expressing his disagreement with the decision and electing the severance option. (ECF No. 48 at ¶ 96). The only accommodation that would have been acceptable to Plaintiff was to remain in his PMR role unvaccinated. (Id. at ¶ 99).

On September 30, 2021, Plaintiff emailed the Leaves and Accommodation team to reaffirm his decision to resign with severance and to provide his personal email address to receive a copy of the severance agreement. Ableidinger responded that a severance agreement would be sent to Plaintiff's personal email address the following week. (Id. at ¶ 100). On October 4, 2021, Plaintiff's employment with ESC was terminated. (Id. at ¶ 101). At the time of his termination, Plaintiff had already accepted a position with another company, Almatica. (Id. at ¶ 102).

## II.    DISCUSSION

### A.    Religious Discrimination/Failure to Accommodate Claim

Plaintiff claims that Defendant ESC discriminated against him by refusing to grant his request for religious exemption from its COVID-19 vaccination requirement in violation of both Title VII and the PHRA.[2] To establish failure to grant a religious accommodation under Title VII, Plaintiff must show that: (1) he held a sincere religious belief that conflicted with a job

---

[2] The Third Circuit has held repeatedly that "[c]laims under the PHRA are interpreted coextensively with Title VII Claims." Atkinson v. Lafayette College, 460 F.3d 447, 454 n. 6 (3d Cir. 2006). Therefore, this Court's decision on Plaintiff's Title VII claims will also apply to Plaintiff's claims under the PHRA.

requirement; (2) he informed his employer about the conflict; and (3) he was disciplined for failing to comply with the conflicting requirement. Smith v. City of Atlantic City, 138 F.4th 759, 774 (3d Cir. 2025) (citations omitted). "The burden then shifts to the employer to show that it either made a good faith effort to accommodate the religious belief, or the accommodation would work an undue hardship upon the employer." Boodoo v. AMP Home Care LLC, 2025 WL 2840801, at *11 (W.D. Pa. Oct. 7, 2025), citing Webb v. City of Philadelphia, 562 F.3d 256, 259 (3d Cir. 2009).

Here, Defendant only challenges Plaintiff's ability to establish the first element of his *prima facie* case of religious discrimination, arguing that it is entitled to judgment as a matter of law because Plaintiff cannot show that his beliefs were religious nor that they were sincerely held. (ECF No. 47, at p. 4). Moreover, even if Plaintiff is found to have established a *prima facie* case of religious discrimination, ESC argues that it offered him a reasonable accommodation, and that Plaintiff's preferred accommodation of remaining in his PMR role unvaccinated would have imposed an undue hardship on the Company. (Id. at p. 13.) The Court will address each argument in turn.

### 1.    Religious Beliefs

In determining whether an employee's beliefs are religious, the Third Circuit considers three factors, or "useful indicia" first articulated in Africa: whether the beliefs (1) "address fundamental and ultimate questions having to do with deep and imponderable matters," (2) are "comprehensive in nature," and (3) "are accompanied by certain formal and external signs." Fallon v. Mercy Catholic Med. Ctr., 877 F.3d 487, 491 (3d Cir. 2017), quoting Africa, 662 F.2d at 1032.

As to "the first factor, beliefs address fundamental and ultimate questions when they consider and attempt to come to terms with what could best be described as ultimate questions-questions having to do with, among other things, life and death, right and wrong, good and evil." Blackwell v. Lehigh Valley Health Network, 2023 WL 362392, at *5 (E.D. Pa. Jan. 23, 2023) (internal quotation marks and citation omitted). As to the second factor, beliefs are comprehensive in nature when they "consist of something more than a number of isolated, unconnected ideas." Gray v. Main Line Hosps., Inc., 717 F. Supp. 3d 437, 446 (E.D. Pa. 2024) (internal quotation marks and citation omitted). The beliefs, therefore, "cannot be generally confined to one question or one moral teaching" but must have "a broader scope" and "lay[ ] claim to an ultimate and comprehensive truth." Id. at 447 (internal quotation marks and citation omitted). As to the third factor, courts must "look to any formal, external, or surface signs that may be analogized to accepted religions such as formal services, ceremonial functions, the existence of clergy, structure and organization, efforts at propagation, observation of holidays and other similar manifestations associated with the traditional religions." Blackwell, 2023 WL 362392, at *5 (internal quotation marks and citation omitted).

Here, Plaintiff cited a number of reasons in his exemption request explaining why the COVID-19 vaccine went against his Christian beliefs. In particular, Plaintiff: (1) cited biblical authority for the belief that his body is a temple of God that must not be defiled, and that he is called to avoid putting any potentially unclean substances in his body; and (2) noted that "many vaccine lines have derived from aborted babies (citing CDC's website)," that "[t]he unborn are recognized by the Bible as humans made in the image of God from the point of conception (Jeremiah 1:5; Psalm 139: 13-16)," and that "[he] [could] not in good conscience inject a substance into [his] body that has been created with research on, and could contain matter from,

11

aborted babies," which would be "unclean, and unacceptable to put in [his] body." (ECF No. 48 at ¶ 38, 40; ECF No. 55-23 at pp. 1-2). He also noted that his Christian beliefs were derived from the Baptist faith, that he had "grown up in the church" and was "very involved" in the church since young adulthood, and that he understood that "the Bible is God's perfect Word" and that "everything in it needs to be carefully observed...." (Id. at ¶ 39; ECF No. 55-23 at p. 1).

Through these explanations, Plaintiff appears to have satisfied the Africa factors. First, his beliefs address fundamental and ultimate questions of life and death, right and wrong, and good and evil. In particular, courts in this circuit have consistently found similar concerns regarding the use of fetal cells derived from aborted babies to be religious under Africa. See Cleckner v. 3M Company, 2025 WL 2524849, at * 8 (M.D. Pa. Sept. 2, 2025); Glover v. Children's Hosp. of Phila., 2025 WL 1527494, at *5 (E.D. Pa. May 29, 2025); Gray v. Main Line Hosps., Inc., 717 F. Supp. 3d 437, 444, 447 (E.D. Pa. 2024); Bushra v. Main Line Health, Inc., 709 F. Supp. 3d 164, 174 (E.D. Pa. 2023); Shields v. Main Line Hosps., Inc., 700 F. Supp. 3d 265, 273 (E.D. Pa. 2023); Aliano v. Twp. of Maplewood, 2023 WL 4398493, at *7 (D.N.J. July 7, 2023).

Second, Plaintiff's beliefs appear to be comprehensive in nature in that the religious reasons he cited in his exemption request are not "a number of isolated, unconnected ideas," but rather stem from Plaintiff's understanding of, and citations to, the Bible. Finally, Plaintiff's beliefs are accompanied by formal and external signs that may be analogized to an accepted religion, as he identifies with the Baptist faith and has been an active Christian since, at least, young adulthood.

Nonetheless, Defendants argue that Plaintiff's beliefs regarding ESC's vaccination requirement were "far more the product of secular philosophy than of a religious orientation."

(ECF No. 47, at p. 7) (internal quotations and citations omitted). Specifically, Defendants argue that Plaintiff's "deposition testimony makes clear that these 'beliefs' are all centered on his personal disagreements with COVID-19 vaccination and other preventative measures, with no ties to any overarching religious creed." (Id. at p. 8). For instance, Defendants point to Plaintiff's stated beliefs that, among other things, (1) "natural immunity is oftentimes the best way to protect" against disease (ECF No. 48, at ¶ 22); (2) COVID-19 vaccines were developed too quickly, contain harmful substances, and the medical risks of receiving them outweigh the benefits (Id. at ¶¶ 56, 60-61); and (3) media endorsement of masking and vaccination in response to COVID-19 was "propaganda" that was both financially and politically motivated (Id. at ¶ 66). In addition, Defendants note Plaintiff's testimony that, even if he did not hold his religious beliefs, he was still likely to come out in favor of not taking the vaccine "based on the evidence that [he had] seen." (Id. at ¶ 63).

The Court agrees that the foregoing list of beliefs regarding the COVID-19 vaccines are secular in nature; however, the fact that Plaintiff's objections to the vaccines were based, in part, on nonreligious factors does not, in itself, negate Plaintiff's expressed religious beliefs that he insists were his primary reason for rejecting the vaccine. Indeed, a growing list of cases have developed in this Circuit among courts that have considered a substantially similar mix of religious and nonreligious beliefs regarding the COVID-19 vaccine, and the vast majority of these courts have denied summary judgment based on the religious beliefs factor, finding, at a minimum, that a genuine issue of material fact existed. See Cleckner, 2025 WL 2524849, at * 8 (despite citing other non-religious beliefs opposing the COVID-19 vaccines, plaintiff's religious beliefs stemming from the purported use of aborted fetal cell lines was found sufficient to establish a sincerely held religious belief); Glover, 2025 WL 1527494, at *6 (finding that the

issue of whether plaintiff's additional nonreligious reasons for opposing the COVID-19 vaccine - including that the vaccine "was made at WARP speed," "is an experiment," and "the risk benefit ratio is not favorable" - nullify the religious reasons he cited - the purported use of aborted fetal cells – is a question of credibility for a jury to decide); Gray, 717 F. Supp. 3d at 448 (finding that although "it very well may be that Plaintiff's aversion to the COVID vaccine is a medical or scientific belief that she attempts to "cloak[] with religious significance," there is "a dispute of material fact as to whether Plaintiff's belief is a sincerely held religious belief to preclude summary judgment"); Bushra, 709 F. Supp. 3d at 174 (finding plaintiff's religious exemption opposing "vaccination involving fetal cell lines … presented sufficient evidence to establish a genuine dispute of material fact on summary judgment"); Shields, 700 F. Supp. 3d at 273 (finding that plaintiff's "belief concerning fetal cell usage is a sincerely held religious belief" sufficient to satisfy the first element of her *prima facie* case of religious discrimination).

This Court agrees with the reasoning of the courts in the foregoing cases and, thus, finds that the issue of whether Plaintiff's beliefs in opposition to ESC's vaccination requirement were primarily religious in nature is a question of credibility for a jury to decide. Thus, the entry of summary judgment on this issue is not appropriate.

### 2.   **Sincerity of Religious Beliefs**

Defendant next argues that, even if the reasons cited by Plaintiff are found to be religious, they are not sincerely held by Plaintiff. However, courts have consistently held that "[t]he sincerity of [a plaintiff's] beliefs is quintessentially an issue of fact that requires credibility determinations by a jury." Cleckner, 2025 WL 2524849, at *9, citing Shields, 700 F.Supp.3d at 270-71 (refusing to determine whether a plaintiff's abortion-related religious beliefs were sincerely held, even though the plaintiff was contemporaneously taking medications that were

14

tested on fetal tissues); <u>Bushra</u>, 709 F. Supp. 3d at 174 ("[i]t is for the jury to determine whether he has a sincerely held religious belief"); <u>Glover</u>, 2025 WL 1527494, at *6 (leaving to the jury a determination on the sincerity of plaintiff's religious beliefs, even though the defendant argued that the plaintiff's beliefs were not sincere "due to his inconsistent positions with respect to vaccines generally…").

Accordingly, the Court finds that there is a genuine issue of material fact as to whether Plaintiff's opposition to ESC's vaccination requirement was based on a sincerely held religious belief, and determination of the same will be left for a jury.

Nonetheless, Defendants argue that, even if Plaintiff is presumed to have established a *prima facie* case of religious discrimination, ESC is still entitled to summary judgment on Plaintiff's religious discrimination/failure to accommodate claim because (1) ESC offered him a reasonable accommodation, and (2) Plaintiff's preferred accommodation of remaining in his PMR role unvaccinated would have imposed an undue hardship on the Company. Each of these arguments will be considered in turn.

### 3. Reasonable Accommodation

Title VII does not define "reasonable accommodation." But, according to the Supreme Court, "a sufficient religious accommodation need not be the 'most' reasonable one (in the employee's view), it need not be the one the employee suggests or prefers, and it need not be the one that least burdens the employee." <u>Shelton v. Univ. of Medicine & Dentistry of N.J.</u>, 223 F.3d 220, 225 (3d Cir. 2000), <u>citing</u> <u>Ansonia Bd. of Educ. v. Philbrook</u>, 479 U.S. 60, 68–69 (1986). "In short, the employer satisfies its Title VII religious accommodation obligation when it offers any reasonable accommodation." <u>Id</u>.

15

Here, ESC argues that it "offered Plaintiff a reasonable accommodation when it gave him the option to transfer to an alternative position within the Company that did not require in-person work." (ECF No. 47 at p. 14). Plaintiff counters that this accommodation was not reasonable because he "was not qualified for any of those random positions and one was never offered to [him] in the few days he was given to review them while in the hospital with his newborn son." (ECF No. 54 at p. 12). In its reply, ESC responds that "the record evidence does not show that [Plaintiff] was 'not qualified' for any other open positions" (ECF No. 59, at p. 3); yet the record evidence also fails to show that Plaintiff was, in fact, qualified for any of them. Indeed, there is very little evidence in the record overall upon which the Court may reach a definitive conclusion that a reasonable accommodation was provided by ESC. Thus, the Court will turn to the Defendants' alternative argument that Plaintiff's preferred accommodation of remaining in his PMR role unvaccinated would have imposed an undue hardship on the Company.

### 4.    **Undue Hardship**

The Supreme Court has clarified that undue hardship requires a showing of "a burden [that] is substantial in the overall context of the employer's business." <u>Groff v. DeJoy</u>, 600 U.S. 447, 468 (2023). The analysis is "fact-specific" and requires the court to "take[ ] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of [an] employer." <u>Id</u>. at 468, 470–71 (internal quotation marks omitted). Both economic and non-economic costs are relevant to the undue-hardship analysis. <u>EEOC v. Geo Grp., Inc.</u>, 616, F.3d 265, 273 (3d Cir. 2010); <u>Bushra</u>, 709 F. Supp. 3d at 175.

Here, Defendants argue that, because Plaintiff's PMR role was "built on in-person visits to healthcare facilities (averaging visits to 40 different facilities per week) and involved frequent

16

face-to-face meetings with healthcare providers and exposure to vulnerable patients – all at the height of the COVID-19 pandemic,… [p]ermitting [Plaintiff] to remain in his PMR position would … have forced [ESC] to take on substantial increased costs in the form of additional risk of spreading COVID-19 to healthcare personnel and patients,… [which] would inevitably result in serious damage to [ESC's] business and reputation with the healthcare providers that make up its customers … [and] could also result in liability were any of those healthcare workers or patients to become seriously ill – or even die – as a result." (ECF No. 47 at p. 15).

Defendants support this conclusion with the expert report of Arthur Reingold, M.D., who details the serious threat COVID-19 posed to the healthcare industry, particularly among employees whose jobs required visiting health care facilities. (ECF No. 48 at ¶ 19). Importantly, Defendants note that ESC's "vaccination requirement announcement came on the heels of updated CDC guidance 'on the need for urgently increasing COVID-19 vaccination coverage'" in the face of a sharp increase in "COVID-19 cases, hospitalizations, and deaths in nearly every state – all fueled by the Delta variant, which was much more contagious than past iterations of the virus." (ECF No. 47 at p. 16) (internal citations omitted). Defendants note further that, at that time, "the CDC stressed that 'the greatest risk of transmission is among unvaccinated people who are much more likely to contract, and therefore transmit the virus' and urged that, though not foolproof, COVID-19 vaccines were "highly effective, including against the Delta variant." (Id. at pp. 16-17).

In response, Plaintiff contends, *inter alia*, that "[ESC] has failed to show that its vaccination policy was implemented in a way to provide any appreciable safety benefit with respect to transmission … [because] COVID-19 vaccines do not stop a person from getting or

transmitting COVID-19…. (ECF No. 54 at p. 11).[3] In support of this contention, Plaintiff has submitted the expert report of Harvey A. Risch, M.D., a professor of epidemiology, who challenges the efficacy of COVID-19 vaccinations in general, opining that "the protection [from the vaccine] is short-lived, that the protection from the first two doses, which is really what we're talking about here, because I believe [ESC's] mandate did not involve boosters, so we're talking about how effective the two doses were in preventing transmission. And the CDC said that basically two doses of the vaccine provided negligible benefit for preventing transmission." (ECF No. 53 at ¶ 407; ECF No. 55-13, at pp. 6-7 (internal pp. 85-86)).

Significantly, however, the CDC statement to which Dr. Risch refers was issued on August 11, 2022, nearly one year after ESC issued its vaccination requirement. (See ECF No. 55-28 at p. 3). Moreover, Dr. Reingold affirmed that booster shots were not made available until "fall/winter 2021 or after," thus nullifying Plaintiff's stress on the fact that ESC did not mandate booster shots as part of its vaccination policy. In short, Plaintiff's attempt to challenge Defendants' undue hardship argument through the use of after-acquired knowledge concerning the purported effectiveness of the COVID-19 vaccinations to prevent transmission of the virus is a red herring. The undue hardship inquiry must focus on the circumstances as they existed at the time ESC considered and denied Plaintiff's preferred accommodation to remain in his PMR role unvaccinated. See, e.g., Henry v. S. Ohio Med. Center, 155 F.4th 620, 632 (6th Cir. 2025) ("[i]n determining whether an accommodation would pose an undue hardship, an employer is

_____

3

Plaintiff also argues that, [f]or about fifteen months during the COVID-19 pandemic, [Plaintiff] fully and safely performed his job duties in the field" while unvaccinated, without "one single instance from the summer of 2020 through October 2021 when an [ESC] employee transmitted COVID-19 to a healthcare provider or patient;" however, the vast majority of this time period predated the spike in COVID-19 cases precipitated by the Delta variant, which ultimately led to the updated CDC guidance on July 27, 2021 and the subsequent implementation of ESC's vaccination requirement at issue.

permitted to draw conclusions based on evidence and information that was available at the time").

In addition, the cases cited by Plaintiff in opposition to Defendant's undue hardship argument are inapposite and unavailing. In particular, in each of the cases cited by Plaintiff, the court denied the employer's summary judgment motion where the employer allowed employees similar to the plaintiff to remain unvaccinated if they complied with other preventative measures such as preventative testing. See Bellard v. Univ. of Tex. MD Anderson Cancer Ctr., 716 F.Supp.3d 503 (S.D. Tex. 2024) (employer granted 310 requests for religious accommodations); Gray, 717 F.Supp.3d at 449 (noting that plaintiff asserted there was no "evidence to suggest how granting her the same accommodations, including routine weekly testing, that were offered to other employees who were granted medical or religious exemptions would have created an undue hardship on its business operations"); Shields, 700 F.Supp.3d at 274 (same). Such is not the case here, as ESC denied all exemption requests and did not permit any PMRs or similar employees to remain in their positions unvaccinated.

Thus, based upon the relevant evidence of record, the Court finds that the safety-related costs of accommodating Plaintiff's request to remain in his PMR role unvaccinated would have constituted an undue hardship on ESC, such that Plaintiff is unable to establish his religious discrimination/failure to accommodate claim as a matter of law.[4] Accordingly, summary judgment will be entered in favor of ESC on such claim.

### B.    Retaliation Claims

Plaintiff has asserted retaliation claims against both ESC and Conroy under Title VII and

---

[4] Other courts have determined as much under similar circumstances. See, e.g., Cleckner, 2025 WL 2524849, at *11; Bushra, 2025 WL 1078135, at *2; Slattery v. Main Line Health, Inc., 2025 WL 1758616, at *5–6 (E.D. Pa. June 25, 2025).

the PHRA (Count II), and against ESC under the FMLA (Count IV). All three of these retaliation claims follow the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 804 (1973). See Neidigh v. Select Specialty Hosp., 664 Fed. Appx. 217, 220 (3d Cir. 2016) (analyzing Title VII, PHRA, and FMLA retaliation claims under the same *McDonnell Douglas* framework) (citations omitted).

### 1.    Title VII Retaliation

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that: "(1) [he] engaged in activity protected by Title VII; (2) the employer took adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action." Selvato v, SEPTA, 658 Fed. Appx. 52, 56 (3d Cir. 2016), citing Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995).  If Plaintiff can establish a *prima facie* case, then the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the employment decision and, if it does so, the plaintiff must be able to establish that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Moore v. City of Phila., 461 F.3d 331, 340-42 (3d Cir. 2006).

Here, Defendants first argue that Plaintiff's "Title VII and PHRA claims fail at the outset because non-religious accommodation requests, such as [Plaintiff's], are not protected under those statutes." (ECF No. 47 at p. 20). However, this argument is premised on a finding that Plaintiff's exemption request was "non-religious," which the Court has already found to be matter of factual dispute. Thus, the argument is a nonstarter.

That being said, Defendants' primary focus of attack is on the third prong of Plaintiff's *prima facie* case, asserting that "all of [Plaintiff's] retaliation claims … fail because there is no

causal connection between any of his alleged protected activity and his termination." (ECF No. 47 at p. 20). This argument is also unavailing.

The Third Circuit has held that "temporal proximity" between the protected activity and adverse employment action will raise an inference of a causal connection for purposes of a *prima facie* case of retaliation if that proximity is "unduly" or "unusually" suggestive, which is generally defined as a period of less than three months. See Moody v. Atl. City Bd. of Educ., 870 F.3d 206, 221 (3d Cir. 2017) ("An inference of 'unduly suggestive' temporal proximity begins to dissipate where there is a gap of three months or more between the protected activity and the adverse action"); Fasold v. Justice, 409 F.3d 178, 190 (3d Cir. 2005) (where time elapsed between protected activity and adverse action is less than three months, there is a sufficient evidentiary basis from which an inference of retaliation can be drawn).

Here, the protected activity claimed by Plaintiff under Title VII includes his request for religious exemption from ESC's vaccination policy on August 11, 2021, and his reporting of Conroy's alleged "discriminatory harassment" during and after Conroy's phone call with Plaintiff on August 31, 2021. Both of these alleged modes of protected activity occurred within two months of Plaintiff's termination on October 4, 2021. That temporal proximity is close enough to raise an inference of causation sufficient to satisfy the third prong of Plaintiff's *prima facie* case of retaliation.

Since Plaintiff has sufficiently established a *prima facie* case, the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for ESC's decision to terminate Plaintiff's employment. This Defendants have done by asserting that "[Plaintiff] was terminated because he failed to comply with [ESC's] vaccination requirement, not because he requested an exemption or engaged in any other purported protected conduct." (ECF No. 47 at p. 21).

Defendants note further that "no reasonable factfinder could find any retaliatory intent behind ESC's denial of [Plaintiff's] accommodation request and resulting termination **because no PMR or other employee whose job required in-person visits to healthcare facilities was permitted to remain in their role unvaccinated.**" (Id. at p. 21) (emphases in original).

In order to overcome Defendants' proffered legitimate non-retaliatory reason for its action, the burden shifts to Plaintiff to prove by preponderance of the evidence that such action was actually a pretext for religious discrimination. This he cannot do.

In his opposition brief, Plaintiff acknowledges that "[t]he focus of [his] retaliation claim … is that Conroy, Condella and Sterken took steps to terminate him while he was on parental leave while allowing another employee, Nicholas D'Anna ("D'Anna"), to remain on leave in accordance with [ESC's] stated policy even though [D'Anna] was unvaccinated and remained unvaccinated upon his return from leave in December 2021 at which time he was placed in a virtual role. D'Anna, unlike [Plaintiff] had never accused Conroy of harassment or retaliation." (ECF No. 54, at p. 15). Based on this, it appears that Plaintiff is claiming that his termination was, in fact, caused by, and in retaliation for, his complaints about Conroy's "discriminatory harassment" during and after Conroy's phone call with Plaintiff on August 31, 2021. However, Plaintiff has cited to no evidence of record connecting his termination to any discriminatory pretext based on his religious beliefs or any other characteristic or conduct protected under Title VII.

The record indicates that the phone call at issue was precipitated by an email Plaintiff sent to Conroy, which provided links to two articles opining that natural immunity was more effective than vaccination against COVID-19. Plaintiff acknowledges that these articles were sent to appeal to Conroy "on a medical scientific perspective" in order to persuade ESC to

22

change its vaccination policy altogether. (ECF No. 48, at ¶¶ 68-69). Plaintiff admits that neither party discussed religion generally or Plaintiff's religious beliefs, in particular, during their phone call. (Id. at ¶ 76). In fact, during his deposition, Plaintiff affirmed that, although Conroy knew Plaintiff was seeking an exemption, he did not know the nature of the exemption or accommodation request. (ECF No. 58 at ¶ 177). Thus, there is no record evidence to support Plaintiff's claim that the alleged "harassment" by Conroy was in any way "discriminatory" in nature or related to any protected characteristic or conduct under Title VII.

Accordingly, Defendants' motion for summary judgment on Plaintiff's claim of retaliation under Title VII and the PHRA will be granted.

### 2. FMLA Retaliation

Similar to Title VII retaliation, to succeed on an FMLA retaliation claim, a plaintiff must show that "(1) [ ]he invoked h[is] right to FMLA-qualifying leave, (2) [ ]he suffered an adverse employment decision, and (3) the adverse action was causally related to h[is] invocation of rights." Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012).

As with Plaintiff's Title VII retaliation claim, and for the same reasons, the Court finds that Plaintiff has sufficiently established a *prima facie* case of retaliation, and that Defendants have articulated a legitimate, non-retaliatory reason for ESC's decision to terminate Plaintiff's employment – Plaintiff's failure to comply with ESC's vaccination policy. Thus, once again, the burden falls upon Plaintiff to prove by preponderance of the evidence that the stated reasons for ESC's decision to terminate him was actually a pretext for FMLA retaliation. This he cannot do.

At most, Plaintiff has pointed to various testimony in the record to infer that Defendants were aware that Plaintiff was on parental leave at the time ESC made the decision to terminate him (ECF No. 54 at pp. 15-16); however, Defendants' awareness that Plaintiff was on parental

leave does not, in any way, establish that his absence on leave was the motivating factor in ESC's decision to terminate him.

Indeed, the record shows that ESC made the Company-wide decision that all employees who had to visit health care providers' offices, including PMRs, would not be provided exemptions to the COVID-19 vaccination requirement and could not remain in their roles unvaccinated (ECF No. 48 at ¶ 89; ECF No. 58 at ¶ 319). In addition, all such employees received the same or similar email that was sent to Plaintiff on September 27, 2021, informing them that their exemption requests were denied and giving them the exact same three options that were given to Plaintiff: (1) become fully vaccinated against COVID-19 by November 19, 2021; (2) express interest in an alternative role within the company that did not require visiting health care providers ; or (3) resign from his employment with severance. (Id. at ¶ 342). Thus, the record establishes that Plaintiff was not treated differently or targeted because he had requested and/or began family medical leave. Moreover, Plaintiff's termination occurred only after Plaintiff advised ESC on September 28, 2021, and again on September 30, 2021, that he chose the option to resign with severance. (ECF No. 48 at ¶¶ 96, 100-101).

In short, there is no evidence of record indicating that Plaintiff's FMLA leave request or status played any role in ESC's decision to terminate his employment on October 4, 2021. Consequently, Defendants' motion for summary judgment on Plaintiff's FMLA retaliation claim will be granted.

### C.    FMLA Interference Claim

In order to make out a claim for interference under the FMLA, a plaintiff must establish that "(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4)

24

the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA." Ross v. Gilhuly, 755 F.3d 185, 191–92 (3d Cir. 2014).

Here, Plaintiff's interference claim is based solely on the fact that he was terminated while he was on parental leave and, as a result, he alleges that ESC denied him benefits he was otherwise entitled to receive under the FMLA. However, the FMLA does not provide employees with a right against termination for a reason other than interference with rights under the FMLA. Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 403 (3d Cir. 2007) (citations omitted); see also 29 C.F.R. § 825.216(a)(1) ("If an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave, maintain group health plan benefits and restore the employee cease at the time the employee is laid off...."). Thus, Plaintiff "will not prevail on his interference claim if [ESC] can establish that it terminated [Plaintiff] for a reason unrelated to his intention to exercise his rights under the FMLA]. Such is the case here.

As noted earlier, the record establishes that Plaintiff was terminated as a result of his failure/refusal to comply with ESC's vaccination requirement. The fact that Plaintiff was on FMLA leave at the time of his termination had no bearing on ESC's decision and did not prevent ESC from terminating him for unrelated reasons. See, e.g., Johnson v. Res. For Human Dev., Inc., 789 F.Supp.2d 595, 606 (E.D. Pa. 2011) ("An employer will not be liable if it proves that the employee would have been terminated even if [he] had not requested and taken FMLA leave"); Throneberry v. McGehee Desha County Hosp., 403 F.3d 972, 978 (8th Cir. 2005) ("the FMLA's plain language and structure dictates that, if an employer were authorized to discharge an employee if the employee were not on FMLA leave, the FMLA does not shield an employee

on FMLA leave from the same, lawful discharge"); <u>Bones v. Honeywell Intern., Inc.</u>, 366 F.3d 869, 877 (10th Cir. 2004) ("if dismissal would have occurred regardless of the request for an FMLA leave, however, an employee may be dismissed even if dismissal prevents her exercise of her right to an FMLA leave").

Based on the foregoing, Plaintiff's FMLA interference claim fails as a matter of law.

**D.    Aiding and Abetting under the PHRA**

Plaintiff's final claim asserts that Defendant Conroy aided and abetted discrimination against him. "[T]he PHRA permits individual liability, but only where the employee 'aid[s], abet[s], incite[s], compel[s] or coerce[s] the doing of any act declared … to be an unlawful discriminatory practice.'" <u>Sztroin v. PennWest Indus. Truck, LLC</u>, 2017 WL 4355575, at *8 (W.D. Pa. Oct. 2, 2017), <u>quoting</u> 43 Pa. C.S.A. § 955(e). "Thus, supervisory employees may be held liable for aiding and abetting a violation of the PHRA." <u>Id</u>.

Here, however, because the Court has already determined that Plaintiff's underlying discrimination and retaliation claims fail as a matter of law, his aiding and abetting claim against Conroy necessarily fails. <u>See</u> <u>McIlmail v. Pennsylvania</u>, 381 F.Supp.3d 393, 415 (E.D. Pa. 2019), <u>quoting</u> <u>Brzozowski v. Pennsylvania Turnpike Comm.</u>, 165 F.Supp.3d 251, 263 (E.D. Pa. 2016) ("Even if an individual employee is a supervisor for purposes of aiding and abetting liability under the PHRA, the Plaintiff must show a 'primary violation' by the employer"); <u>Stepp v. Fairpoint Communications, Inc.</u>, 2007 WL 4248559 at * 9 (W.D. Pa. Nov. 30, 2007) (finding that, because employer's conduct was not unlawful, "there waws no discrimination or retaliation for [supervisor] to aid and abet"); <u>Kaniuka v. Good Shepherd Home</u>, 2006 WL 2380387, *10 (E.D.Pa. Aug.15, 2006) (holding that "[i]ndividual defendants cannot violate PHRA section 955(e) when there is no corresponding section 955(a) violation by an employer to aid and abet").

An appropriate Order follows.

27